INMAN, Judge.
 

 In this case we hold that a trial court's order requiring the parties to participate in a specific method of treatment within the scope of an existing comprehensive child custody order does not modify the terms of custody and therefore does not require a
 finding of changed circumstances or a motion to modify the governing order. We also hold that a trial court's order providing additional dates and locations for custodial visitation not inconsistent with the governing child custody order is not a modification of the terms of custody.
 

 Shakunthala S. Pithavadian (Defendant, "Mother") appeals an Order requiring weekend visitation between her minor child and his father, Harsha Tankala (Plaintiff, "Father") and ordering the parties and their child to attend a family therapy camp if the parties and their son fail to comply with the ordered visitation. After careful review, we affirm the trial court's Order.
 

 I. Factual and Procedural Background
 

 Father and Mother were married on 6 March 1998 and divorced on 27 October 2003. They had one child together, Peter,
 
 [1]
 
 a son born 26 July 1999, who is now sixteen years old. The Judgment of Divorce, entered 31 October 2003 by the New York Supreme Court, Kings County, included a stipulation of settlement covering, among other things, child custody and child support. At the time of the stipulation, Mother resided in New York and Father resided in Delaware. A few weeks after entry of the divorce judgment, Mother notified Father that she was moving with Peter to North Carolina.
 

 On 22 July 2004, a few days before Peter's fifth birthday, the New York Supreme Court, Kings County, entered an order ("the New York Custody Order") modifying the child custody settlement. The New
 York Custody Order allowed Mother to move with Peter to Morrisville, North Carolina and granted Father visitation with Peter on alternate weekends. The New York Custody Order also required Mother, at her sole cost and expense, to bring Peter to meet Father at the airport in Baltimore, Maryland or Hartford, Connecticut, as specified by Father, and for Father to bring Peter home, or to the homes of Father's brothers.
 

 On 23 June 2010, Father filed in Wake County District Court an Amended Petition for and Notice of Registration of Foreign Child Custody Order. The petition asserted that Father resided in Dover, Delaware and Mother resided in Cary, North Carolina. On 26 July 2010, which coincidentally was Peter's eleventh birthday, the trial court entered an order confirming registration of the New York Custody Order. The order was served on Mother at her home address in Cary. On that same date, Father filed motions to modify child custody, for appointment of a parenting coordinator, and for an Order to Show Cause why Mother should not be held in contempt for violating the New York Custody Order. On 30 July 2010, Father filed a motion seeking a custody evaluation. Father's motions alleged that he had not been allowed any visitation for nearly four months and that Peter refused to visit with him or even speak to him by phone; that Mother was "actively alienating" Peter from Father; and that a custody evaluation was necessary to assess "the mental health status of the parties and child."
 

 On 30 July 2010, the trial court entered an Order to Appear and Show Cause, finding probable cause that Mother had violated the terms of the New York Custody Order and requiring Mother to appear in October 2010 regarding the contempt allegations. Before any further hearing, however, on 26 October 2010, the parties, their respective counsel, and Judge Debra Sasser signed consent orders for a custody evaluation and the appointment of a guardian
 
 ad litem
 
 to protect Peter's interests. An evaluation report that recommended individual mental health treatment for Peter and each of his parents and reunification therapy for Peter and Father was issued on 18 January 2011. The other pending motions were scheduled for hearing in March 2011.
 

 Following a three-day hearing, the trial court entered a twenty-one-page order ("the North Carolina Custody Order") on 6 June 2011, finding that a substantial change of circumstances affecting the welfare of Peter had occurred since the entry of the New York Custody Order. The court made specific findings of fact regarding Mother's interference with Father's visitation, Father's physical and verbal aggression toward Peter, and Peter's anxiety and emotional distress.
 

 The court found,
 
 inter
 

 alia.
 
 that as of March 2011, Peter "did not appreciate the need to have a relationship with his father" and that Mother had "overly nurtured" Peter and had "stunted [Peter]'s social and emotional development" in the years since relocating with Peter to North Carolina. The court also found that the appointment of a parenting coordinator was appropriate because "this is a high-conflict case."
 

 On the same date as it entered the North Carolina Custody Order, the trial court entered an order ("the Contempt Order") finding that Mother had willfully violated the New York Custody Order by depriving Father of weekend and holiday custody and excluding Father from information and decisions about Peter's education and health care. The court concluded that Mother was in willful contempt but stayed a sentence of imprisonment on the condition that Mother comply with all orders of the trial court including the North Carolina Custody Order.
 

 The North Carolina Custody Order granted the parties joint custody, granting Mother primary physical custody and granting Father periodic weekend and holiday visitation, contingent upon approval by a psychologist whom the trial court designated as a reunification therapist and also designated to treat Peter in individual therapy. The trial court specifically ordered as follows:
 

 [Father] and [Peter] shall engage in reunification therapy, with Eli Jerchower as the reunification therapist. The reunification therapy shall begin at the time recommended by Dr. Jerchower, and
 
 the timing and methods of this reunification therapy (including whether and to what extent [Mother] takes part) shall be at the discretion of the therapist.
 
 [Father] and [Mother] shall both follow all of the recommendations of Dr. Jerchower regarding the reunification therapy, and this reunification therapy shall continue for so long as the therapist continues to recommend it.
 

 (Emphasis added.) The trial court also ordered that the parties equally divide all of the costs of the reunification therapy not covered by insurance. The trial court required that Mother and Father each participate in individual counseling with different therapists, providing that therapists for each of the parents and Peter be authorized to communicate with one another, with the parenting coordinator, and with the guardian
 
 ad litem
 
 for Peter. The trial court further directed all therapists to read a particular paragraph of the custody evaluation report regarding therapy services recommended for Peter and his parents.
 

 Neither party appealed the North Carolina Custody Order.
 

 The reunification therapist, Dr. Jerchower, worked with Peter individually and in joint sessions with Peter and Father, but observed in a report to the parties, the parenting coordinator, and the trial court that Peter "maintained a defiant oppositional stance when it came to his father and engaging with him in any way." By the spring of 2012, in the view of the reunification therapist, "it was clear that [Peter] was no longer making progress in reunification with seeing his father" and the therapist believed that a "more intensive treatment approach" was necessary.
 

 On or about 16 May 2012, nearly a year after entry of the North Carolina Custody Order, the reunification therapist recommended that Peter and both of his parents attend a four-day high-conflict divorce camp called "Overcoming Barriers" in California beginning six weeks later, on 29 June 2012. The camp cost $9,000 per family. The court-appointed parenting coordinator at the time, V.A. Davidian, agreed with the therapist's recommendation and on 4 June 2012 he instructed Mother and Father to apply for the camp and make arrangements to attend with Peter. In response, Mother asked the parenting coordinator to reconsider his recommendation, and when that request was denied, Mother filed a Motion for Expedited Review of Parenting Coordinator's Decision. The motion argued that requiring the parties to attend the camp was not consistent with the terms of the North Carolina Custody Order; exceeded the authority of the parenting coordinator; was not an appropriate fit for the parties; was not in Peter's best interest; and that the one-month time frame between the recommendation and the camp dates was too short for the parties and Peter
 to prepare and make travel arrangements. The motion also asserted that Mother could lose her job if she missed work for the camp. It appears from the record, however, that Mother did not seek to have her motion calendared for hearing, that neither Father nor the parenting coordinator sought to have the motion calendared for hearing, and that the motion was never heard by the trial court. The parties did not attend the camp.
 

 A little over a year later, in an order dated 16 July 2013, shortly before Peter's fourteenth birthday, the trial court appointed a new parenting coordinator, Genevieve Sims ("Ms. Sims"). On 23 September 2014, Ms. Sims filed a Notice of Determination that Requires a Court Hearing pursuant to N.C. Gen.Stat. § 50-97, attaching a report recommending,
 
 inter alia.
 
 that Peter and his parents attend the out-of-state camp for families dealing with high-conflict divorce. The report stated that Ms. Sims agreed with the reunification therapist's assessment that Mother
 "has engaged in behaviors demonstrating a lack of commitment to the reunification process and those behaviors have been communicated to Peter in thought and actions." Ms. Sims asked the trial court to accept the reunification therapist's recommendations, which were attached to and incorporated within her report. The recommendations included the "Overcoming Barriers" camp that the reunification therapist had recommended two years earlier. Ms. Sims advised the trial court that, consistent with the recommendation of her predecessor and the reunification therapist, she "strongly recommend[ed] that ... the parties and child attend a minimum of a four-day intensive reunification camp."
 

 Ms. Sims also filed on 23 September 2014 a Notice of Hearing and Calendar Request for three hours on 13 February 2015 for the trial court to consider her recommendations. Counsel for both parties and Ms. Sims attended the hearing and, after reviewing Ms. Sims' report and attached materials, and considering the arguments of counsel, the trial court agreed with Ms. Sims' recommendation, including specifically the camp, and asked for recommendations from counsel for each of the parties as an alternative to the camp. Father's counsel proposed requiring Peter to visit with his paternal cousins in Delaware on weekends beginning in March 2015, providing Father the opportunity to see Peter for brief periods during those visits. Mother's counsel agreed with the proposed visitation schedule. The court instructed counsel to confer with the reunification therapist as well as the therapists for Father and Mother, all of whom were on telephone standby to testify at the hearing, to discuss the proposed alternative. However, the trial court admonished the parties that if they could not agree on an alternative, "you're going to camp."
 

 The hearing resumed that same day, after counsel for the parties conferred with the therapists. Ms. Sims reported to the trial court that the plan approved by all therapists was for Peter to visit Father's family in the Washington, D.C./Maryland area, and to see Father over gradually increasing segments of time during those family visits, and that "if that does not go well, then the parties will immediately attend the first available four-day intensive camp." To prepare for that contingency, the reunification therapist would assist Mother and Father in immediately applying for the camp, including sharing the cost of a $100 application fee for the next available camp session, scheduled for April 2015 in Arizona. Counsel for Mother confirmed Ms. Sims' report of the plan approved by all therapists and asked the trial court if the camp would take priority over all of Peter's other plans, including attending school. The trial court responded that "camp is number one on the priority list if
 things don't ... work out." The trial court elaborated that "if we have an issue where weekends go well and there's no camp in April and then for some reason things go downhill and decline, we're going back to camp." The trial court reiterated that if the scheduled visits "don't progress according to the likes of the health care providers with those weekends in the manner in which they're going to set them out, then the first time that there's any resistance and everything comes off the track, everybody's going to camp."
 

 On 10 March 2015, Ms. Sims submitted a proposed order. The trial court judge made
 modifications and entered an Order on 12 March 2015 ("the Order"). The Order, which is the basis for this appeal, provided for Peter to visit on weekends with paternal family members and Father on a recurring basis, with visitations beginning in March 2015 in locations alternating between the D.C./ Maryland area and the Cary, North Carolina area. If the court-ordered visits were "not progressing," the trial court ordered the parties and Peter to attend the Overcoming Barriers Family Camp. The trial court concluded that "[t]he Parenting Coordinator has the authority to order the parents to attend the Overcoming Barriers Family Camp or any similar therapeutic 'camp' or intensive weekend experience offered by Overcoming Barriers." Further, the trial court added, "[a]ttendance for the weekend visits and/or [camp] shall take priority over any other activity in which Peter is scheduled to be involved."
 

 Mother filed a Notice of Appeal and a Motion for Stay of Proceedings. In her motion for a stay of proceedings, Mother alleged,
 
 inter alia.
 
 that the findings of fact were unsupported by sufficient evidence because no evidence was presented at the hearing, there was no motion to modify the existing custody order, Mother was entitled to (and did not receive) ten-day notice prior to a hearing to modify custody per N.C. Gen.Stat. § 50-13.5, and the trial court did not find that there had been a substantial change in circumstances. The trial court denied the motion.
 

 II. Analysis
 

 A. Appellate Jurisdiction.
 

 Before addressing the merits of the appeal, we must first address the issue of appellate jurisdiction. The Order is a permanent order and thus fully reviewable on appeal.
 

 "A judgment is either interlocutory or the final determination of the rights of the parties." N.C. Gen.Stat. § 1A-1, 54(a) (2015).
 

 A final judgment is one which disposes of the case as to all the parties, leaving nothing to be judicially determined
 between them in the trial court. An interlocutory order does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy.
 

 Washington v. Washington,
 

 148 N.C.App. 206
 
 , 207,
 
 557 S.E.2d 648
 
 , 649 (2001) (quoting
 
 Veazey v. City of Durham,
 

 231 N.C. 357
 
 , 361-62,
 
 57 S.E.2d 377
 
 , 381 (1950) ) (editing marks omitted). "In general, there is no right to appeal from an interlocutory order."
 
 Mills Pointe Homeowner's Ass'n v. Whitmire,
 

 146 N.C.App. 297
 
 , 298-99,
 
 551 S.E.2d 924
 
 , 926 (2001) (citations and editing marks omitted).
 

 In the context of child custody orders, "a distinction is drawn in our statutes and in our case law between 'temporary' or 'interim' custody orders and 'permanent' or 'final' custody orders."
 
 Regan v. Smith,
 

 131 N.C.App. 851
 
 , 852,
 
 509 S.E.2d 452
 
 , 454 (1998) (citation omitted). "Temporary custody orders resolve the issue of a party's right to custody pending the resolution of a claim for permanent custody."
 
 Brewer v. Brewer,
 

 139 N.C.App. 222
 
 , 228,
 
 533 S.E.2d 541
 
 , 546 (2000). "Normally, a temporary child custody order is interlocutory and does not affect any substantial right which cannot be protected by timely appeal from the trial court's ultimate disposition on the merits."
 
 Brewer.
 

 139 N.C.App. at 227
 
 ,
 
 533 S.E.2d at 546
 
 (internal quotation marks and citation omitted). "[A]n order is temporary if either (1) it is entered without prejudice to either party, (2) it states a clear and specific reconvening time in the order and the time interval between the two hearings was reasonably brief; or (3) the order does not determine all the issues."
 
 Senner v. Senner,
 

 161 N.C.App. 78
 
 , 81,
 
 587 S.E.2d 675
 
 , 677 (2003). "If the order does not meet any of these criteria, it is permanent."
 
 Peters v. Pennington,
 

 210 N.C.App. 1
 
 , 14,
 
 707 S.E.2d 724
 
 , 734 (2011).
 

 The Order does not meet any of the three requirements of a temporary order. The Order was entered with prejudice to both parties and did not state a clear and specific reconvening time. It only states that "[t]he Court retains jurisdiction for the entry of further Orders[,]" which does not satisfy the "clear and specific" requirement or the "reasonably brief" interval requirement.
 

 Senner,
 

 161 N.C.App. at 81
 
 ,
 
 587 S.E.2d at 677
 
 . Finally, the Order determined all the issues before the trial court at the hearing. The issue of child custody had already been resolved per the North Carolina Custody Order entered 6 June 2011. The Order addresses all the issues presented by the parenting coordinator and leaves none unresolved. Accordingly, this Court has jurisdiction to review Mother's appeal from the Order.
 

 During the hearing resulting in the Order, counsel for Mother did not raise objections based on any of the issues she raises in this appeal, including modification of the visitation schedule or the requirement of the parties and Peter to attend the out-of-state reunification camp on the ground that it constituted a modification of the governing custody terms. For issues other than the camp, Defendant's attorney stated: "For the record, I do not object to the recommendations of the plaintiff. I accept Your Honor's recommendations and agree that that seems to be a prudent way to proceed." Regarding the camp, Defendant made no objection for lack of a motion to modify, notice of a motion to modify, or finding of substantial change in circumstances necessary to modify the North Carolina Custody Order. However, these issues concern subject matter jurisdiction and can be raised for the first time on appeal.
 
 Hart v. Thomasville Motors,
 

 244 N.C. 84
 
 , 90,
 
 92 S.E.2d 673
 
 , 678 (1956). Accordingly, Mother's appeal is properly before us.
 

 1. Standard of review.
 

 "Absent an abuse of discretion, the trial court's decision in matters of child custody should not be upset on appeal."
 
 Everette v. Collins,
 

 176 N.C.App. 168
 
 , 171,
 
 625 S.E.2d 796
 
 , 798 (2006). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Hennis,
 

 323 N.C. 279
 
 , 285,
 
 372 S.E.2d 523
 
 , 527 (1988) ;
 
 see also
 

 White v. White,
 

 312 N.C. 770
 
 , 777,
 
 324 S.E.2d 829
 
 , 833 (1985) ("A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason ... [or] upon a showing that [the trial court's decision] was so arbitrary that it could not have been the result of a reasoned decision.").
 

 B. The Order did not modify the North Carolina Custody Order and is not procedurally defective.
 

 Mother argues that the Order requiring the parties and Peter to attend the high-conflict divorce camp and requiring additional visitation was invalid because it modified a prior custody order without the required motion to modify and findings and conclusions regarding a change in circumstances to justify such modification. We disagree.
 

 Disputes over variations in custody arrangements including timing, location, and treatment often lead to costly and time-consuming litigation that can hinder progress in child custody cases and cause delays which are detrimental to the best interests of the children involved. To avoid such delays, trial courts prepare comprehensive child custody
 orders, like the North Carolina Custody Order governing the parties in this case, and appoint parenting coordinators authorized to facilitate the parties' compliance with court orders without having to seek additional orders from the court in every instance. In cases involving minor children requiring mental health treatment, trial courts often delegate to therapists control over treatment and visitation, but remain available to assert the court's authority if needed.
 
 See
 

 Peters,
 

 210 N.C.App. at 18-20
 
 ,
 
 707 S.E.2d at 737-38
 
 (affirming the trial court's delegation to the custodial parent, in conjunction with the minor children's therapist, control over the non-custodial parent's supervised visitation: "Because a neutral third party is vested with authority to control therapeutic visitation, the visitation arrangement does not present the problems inherent in custodian-controlled visitation.");
 
 Cox v. Cox,
 

 133 N.C.App. 221
 
 , 230,
 
 515 S.E.2d 61
 
 , 67-68 (1999) (upholding the trial court's order that a physician could "suspend or terminate counseling, treatment, and supervised visitation if he determine [d] that [one parent] [was] not progressing or working honestly toward improvement").
 

 The Order does not modify the terms of custody, but rather provides specific
 requirements within the scope of the North Carolina Custody Order. The Order does not modify the earlier award of primary custody to Mother and visitation to Father. The requirement that the parties and Peter attend the high-conflict divorce camp as recommended by the reunification therapist and the parenting coordinator is consistent with the requirement in the earlier order that the parties abide by those professionals' recommendations for treatment and visitation scheduling. Although the North Carolina Custody Order did not mention an out-of-state therapeutic camp for the family, it specifically ordered reunification therapy and provided that the timing and methods of therapy were left to the reunification therapist to decide. Similarly, specific provisions for Peter's visitation with Father and Father's family in the Order do not conflict with provisions in the North Carolina Custody Order. Accordingly, no motion for custody modification was required, and the trial court was not required to find or conclude that circumstances affecting the welfare of Peter had substantially changed since the entry of the North Carolina Custody Order.
 

 Furthermore, Mother's argument that she received inadequate notice of a hearing concerning the out-of-state camp rings hollow in light of the record in this case. Nearly five months before the hearing which resulted in the Order, the court-appointed parenting coordinator filed a notice that a court hearing was required to review her determination that the parties and Peter should be required to attend the camp recommended
 by the reunification therapist within the scope of authority delegated in the North Carolina Custody Order. As a practical matter, Mother had more than two years' notice of the reunification therapist's recommendation and the parenting coordinator's determination that Peter and his parents attend the camp, but she successfully avoided that treatment method by opposing the initial notice in 2012 and failing to seek a hearing. The record does not indicate that Father or the parenting coordinator sought court intervention following Mother's objection and refusal to participate in the camp.
 

 1. Parenting coordinators.
 

 North Carolina's parenting coordinator statutes were first adopted in 2005 as Article 5 of Chapter 50 of our General Statutes.
 
 See
 
 Act of July 27, 2005,
 
 2005 N.C. Sess. Laws 228
 
 ("An Act to Establish the Appointment of Parenting Coordinators in Domestic Child Custody Actions"). N.C. Gen.Stat. § 50-91(a) - (b) (2015) provides that a "court may appoint a parenting coordinator at any time during the proceedings of a child custody action ... if all parties consent to the appointment[,]" or "if the court also makes specific findings that the action is a high-conflict case, that the appointment ... is in the best interests of any minor child in the case, and that the parties are able to pay for the cost...." A parenting coordinator has the limited authority to engage in matters that will help the parties:
 

 (1) Identify disputed issues.
 

 (2) Reduce misunderstandings.
 

 (3) Clarify priorities.
 

 (4) Explore possibilities for compromise.
 

 (5) Develop methods of collaboration in parenting.
 

 (6) Comply with the court's order of custody, visitation, or guardianship.
 

 N.C. Gen.Stat. § 50-92(a)(1)-(6) (2015). A trial court "may authorize a parenting coordinator to decide issues regarding the implementation of the parenting plan that are not specifically governed by the court order and which the parties are unable to resolve. The parties must comply with the parenting coordinator's decision until the court reviews the decision." N.C. Gen.Stat. § 50-92(b) (2015).
 

 North Carolina's parenting coordinator statutes have been largely unexplored by the appellate courts. This case demonstrates the potential
 utility of parenting coordinators as well as the procedural safeguards that, if the parties assume the responsibility of seeking the court's intervention, ensure the trial court remains involved in resolving disputes between the parenting coordinator and one or both parents. However, the failure of the trial court and the parenting coordinator in this case to obtain the parties' compliance with the North Carolina Custody Order for a period of nearly four years demonstrates the
 shortcomings of family court proceedings in which fundamental disputes languish while the child approaches adulthood. As a result of inaction, this high-conflict child custody dispute was not resolved any more quickly than it likely could have been without a parenting coordinator.
 

 2. The Order is not a child support order.
 

 In her final challenge to the Order, Mother contends that because the Order compels her and Peter to participate in the camp at some financial expense, and because the Order compels her to facilitate Peter's travel to visit Father, it is an invalid modification of the parties' child
 
 support
 
 obligations, which are beyond the scope of the trial court's jurisdiction. This argument is unsupported by the record and the law.
 

 Mother correctly notes that although Father registered the New York Custody Order with the trial court in this case, neither party registered the initial judgment of divorce filed in New York in 2003, so that the trial court has no jurisdiction over the terms of that order. However, Mother erroneously contends that because uninsured mental health expenses and travel expenses may, in the trial court's discretion, be allocated as "extraordinary expenses" for the purpose of determining child support, the trial court here had no authority to require Mother to pay these expenses as part of the Order. The New York Custody Order, which was registered by the trial court below, required Mother to pay all travel expenses incurred by Peter and by Father for visitation. The North Carolina Custody Order found that neither Father nor Mother remained living in New York, that Mother and Peter had resided in North Carolina for more than six months preceding Father's motion to modify custody, that North Carolina had become Peter's home state, that the trial court had jurisdiction to modify child custody, and that no other state had sought to modify the custody arrangements. The North Carolina Custody Order, which included findings of a substantial change in circumstances, provided that "[e]ach party shall bear the costs of his or her own travel related to custody exchanges, and the parties shall equally divide the cost of [Peter]'s travel related to custody exchanges." The North Carolina Custody Order made similar provisions for all costs of individual and reunification therapy not covered by insurance. The decisions by this
 Court cited by Mother as requiring that travel and mental health treatment costs be determined within a child support order do not so hold.
 
 See
 

 Peters,
 

 210 N.C.App. at 23
 
 ,
 
 707 S.E.2d at
 
 739 ;
 
 Mackins v. Mackins,
 

 114 N.C.App. 538
 
 , 548,
 
 442 S.E.2d 352
 
 , 358 (1994) ;
 
 Lawrence v. Tise,
 

 107 N.C.App. 140
 
 , 149-50,
 
 419 S.E.2d 176
 
 , 182-83 (1992).
 

 III. Conclusion
 

 We conclude that the trial court had jurisdiction to enter the Order from which this appeal arises and that the trial court did not abuse its discretion. The order of the trial court is
 

 AFFIRMED.
 

 Judges STEPHENS and HUNTER, JR. concur.
 

 A pseudonym is used to protect the identity of the minor child.